**IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

RANDY ROBERTS, an individual,

        Plaintiff,

v.                                  CIVIL ACTION NO. 3:07-0593

AMERICAN ELECTRIC POWER
LONG-TERM DISABILITY PLAN,
an Employee Benefits Plan, et al.,

        Defendants.

**MEMORANDUM OPINION AND ORDER**

Pending are the parties' cross motions for summary judgment (Docs. 52 and 54). For the reasons explained below, Defendants' motion (Doc. 52) is **GRANTED** while Plaintiff's motion (Doc. 54) is **DENIED**.

**Background**

In 1988, Plaintiff, Randy Roberts, was working as a lineman for American Electric Power (AEP). On December 29th of that year, he slipped from a forty-five foot power-pole and landed on his back. His co-workers took him to Appalachian Regional Hospital, where he was admitted for a week. Doctors placed him in traction and subsequently performed two operations on his knee for a fractured patella. He has since had knee and back problems. As a participant of the American Electric Power Long-Term Disability Plan (the Plan), Mr. Roberts received benefits as a result of his injury from the time shortly after his accident until July 2005. In July 2005, Mr. Roberts's benefits were terminated by the Plan's claims administrator, which was Broadspire Services Inc. at

that time. Mr. Roberts successfully appealed this denial and his benefits were reinstated on February 27, 2006. A few months later, Broadspire conducted additional review. This review resulted in a second decision to deny benefits on May 11, 2006. This denial was upheld on all levels of administrative appeal. Mr. Roberts filed suit in this Court to challenge those administrative decisions.

## I.        The Plan

The Plan contains the following description of disability:

> You must meet the plan's definition of disability to receive [Long Term Disability] LTD benefits. "Disability" is defined differently for the first two years of your disability as compared to disabilities that continue beyond two years.
>
> For the initial 24-month period from the date of disability, "disability" is defined as an illness or injury that requires the regular treatment of a daily qualified physician that my reasonably be expected to prevent you from performing the material duties of *your occupation*.
>
> After the first 24 months following your date of disability, "disability" is defined as an illness or injury that requires regular treatment of a duly qualified physician that may reasonably be expected to prevent you from performing the duties of *any occupation for which you are reasonably qualified* by your education training, and experience.

Admin. Record at 2520-21. If a participant meets this plan definition of disability, he is entitled to receive benefits equivalent to 60 percent of his base monthly pay. The Plan pays these benefits for the first twenty-four months if the participant is disabled from his own occupation. After this period, the participant can receive benefits until the retirement age of 65 if he is determined to be disabled

-2-

from any occupation for which he is reasonably qualified.  These benefits can, however, be terminated prior to age 65 if the participant is no longer disabled or fails to provide satisfactory proof of a continuing disability.  Benefits can also be reduced for specific categories of "other income" that the participant might receive.

The Plan is funded by the participating AEP companies, either directly or through trusts funded by AEP.  It expressly designates a "plan administrator" – the American Electric Power Service Corporation. The Plan documents provide that this administrator has "the authority to control, administer, and manage the operation" of the Plan.  Am. Compl.. Ex. A at 42.  Included with the rights and responsibilities assigned to the Plan administrator are the following:

> interpret, construe, and administer the plans, make determinations regarding plan participation, enrollment and eligibility for benefits, evaluate and determine the validity of benefits claims and resolve any and all claims and disputes regarding the rights and entitlements of individuals to participate in the plans and to receive benefits and payments pursuant to the plans.

*Id.*  In line with its responsibilities under the Plan, the American Electric Power Service Corporation designated a separate claims administrator.   This claims administrator has "full discretion and authority to determine eligibility for benefits and for continued benefits and to construe and interpret all terms and conditions of the plan."  *Id.* at 18.  This claims representative was Broadspire Services at the time of Plaintiff's first denial of benefits and Aetna at the time of the denial challenged before this Court.

## II.    **Plaintiff's Claims Process and Medical History**

After Plaintiff's accident, Dr. Diane Shafer, an orthopedic surgeon, operated on his knee and continued to treat him for several years.  In attending physician's statements, sent to the claim's administrator, Dr. Shafer consistently rated him as having a Class 5 physical impairment according to the definition within the Federal Dictionary of Occupational Titles.  This meant that she viewed him as having "[s]evere limitations of functional capacity; incapable of minimal (sedentary) activity."  Her prognosis for return to work was consistently described as either "poor" or "never."  Between 1989 and 1993, she also indicated that he had some mental or nervous impairment rated between a 2 and a 5.  Level 2 is defined as "[p]atient is able to function in most stress situations and engage in most relations."  Level 5 is defined as "[p]atient has significant loss of psychological, physiological, personal and social adjustment."

On August 8, 1989, Mr. Roberts visited a second orthopedic surgeon, Dr. Konduru Raju.  Dr. Raju's opinion was that his patient had suffered a musclo-ligamentous injury to the back.  He noted significant decreased mobility in both the knee and back.  He concluded that at the time of his visit,

Plaintiff could not return to his job and was not a candidate for manual labor.  He did find, however, that if Mr. Roberts "can get a sedentary job wherein he can sit at a desk with periodic rest he will be able to perform his activities."  Admin. Rec. at 166. Dr. Raju was optimistic that with physical therapy and "work hardening" Mr. Roberts's prognosis was good and even opined that he might be able to return to work "within the next few weeks."  *Id.*

While continuing to suffer from knee and back pain, in 1990, Plaintiff visited a third orthopedic surgeon, Dr. Omitowoju at Logan General Hospital.  Dr. Omitowoju noted that Mr.

-4-

Roberts had paraspinal muscle spasms of the back, along with tenderness and a decreased range of

motion.  He also reported results from an MRI, showing a herniated disc in Mr. Roberts's spinal

column.  On the knee he noted that Mr. Roberts had a full range of motion but some crepitation in

the joint.  Dr. Omitowoju concluded,

> [Mr. Roberts] is totally disabled from his present
> occupation.  His prognosis for . . . returning as a full
> time employee to this particular employment is poor,
> but to some time of full time employment, the
> prognosis is guarded in the sense that the type of job
> this patient will be able to do is going to be a
> sedentary type [sic]. . . . I will recommend that this
> patient should be evaluated by a neurosurgeon to see
> whether he will benefit from a laminectomy and the
> removal of the herniated disc.  If this is done and the
> treatment is successful . . . the patient could be
> retrained for a sedentary type of job or for the kind of
> job that it not going to involve any climbing or lifting.

Admin. Rec. at 104-05.

On November 15, 1990, the West Virginia Workers' Compensation Fund referred Mr.

Roberts to Dr. Anba Nadar.  Dr. Nadar concluded that Mr. Roberts had a permanent impairment of

approximately ten percent based on his back and an additional two percent based on his knee.  He

noted that "it is possible that he will be unable to return to his former employment which requires

climbing, and he may benefit from vocational rehabilitation."  Admin. Rec. at 919.

Also in 1990, Mr. Roberts applied for federal Social Security Disability (SSDI) benefits.  He

claim was initially denied by the Social Security Administration.  A reconsideration in 1993,

likewise resulted in denial.  In 1995, however, he was awarded SSDI benefits retroactive to 1992.

This successful appeal of the Social Security Administration's earlier decisions was conducted with

encouragement and support from the Plan.

On June 9, 1994, Mr. Roberts participated in a Functional Capacity Evaluation (FCE) with Pamela Howard, a physical therapist.  Ms. Howard noted that Mr Roberts exhibited decreased range of motion in the lumbar region of his back, decreased strength in heel to toe walking, and that he walked with a limp.  He also complained of significant pain. The FCE, however, expressed some skepticism about the level of pain, commenting "[w]e question his understanding of the subjective ratings of pain . . ." Admin Rec. at 140.  Ms. Howard also reported that Mr. Roberts appeared "to have no motivation, appears to be very satisfied with the lifestyle he has at this time or has no goals or ambitions toward rehabilitation." *Id.*  In a letter to Aetna, he concluded that Mr. Roberts had the ability to work at the sedentary level. *Id.* at 134.

Possibly as a result of this FCE, Mr. Roberts was referred to Dr. Colin Craythorne at Scott Orthopedic Center for an Independent Medical Examination (IME).  Dr. Craythorne's impression was that,

> This man remains disabled.  He does not have much in the way of objective findings, but his MRI appears quite positive for 3 herniated discs, that at the L3-4 being of significance.  He cannot return to work at this time.  I do not think he will be able to return any type of work based on his complaints and other diagnosis given.  He has difficulty with prolonged standing and prolonged sitting.

Admin. Rec. at 145.

Mr. Roberts visited Dr. R. E. Thompson, a chiropractor twice a month for at least four months between January and April 1996.  In an attending physician's statement from a visit on April 15, 1996, Dr. Thompson noted that Mr. Roberts was capable of sedentary activities and had a suffered from a Class 4 Physical Impairment meaning – "[m]oderate limitation of functional capacity; capable of clerical/administrative (sedentary) activity."  Admin. Rec. 1008.

It appears that Plaintiff began seeing his primary care physician, Dr. Lance, in 1997.  In an attending physician statement from August 19, 1997, Dr. Lance rated Mr. Roberts's physical impairment at Class 5.  He noted that his patient's prognosis was poor and estimated the date of his return to work as "never."  Later reports by Dr. Lance have inconsistent findings.  *See* Admin. Rec. 1024-25.  On March 21, 2000, for example he found that Mr. Roberts's condition had deteriorated, that no return to work was expected and prognosis for recovery was poor; however, he also indicated that Mr. Roberts's physical capability had increased to the level were he was "capable of exerting up to 10 lbs of force occasionally, sitting most of the time, and occasional walking and standing," in other words "sedentary" work.  *Id.*  Similar conclusions were indicated in a 2004 report with the addition of a hand-written statement that the patient "is permanently and totally disabled."

On December 26, 2001, Mr. Roberts was referred to Dr. R. L. Leadbetter for an IME. Responding to the question "[d]oes the evidence support permanent total disability?" Dr. Leadbetter answered, "[a]t this point the evidence clearly supports permanent total disability and the patient is unable to engage in any significant work activity."  *Id.* at 82.  Dr. Leadbetter concluded,

> [h]is prognosis is extremely poor at this time. However, because of his relatively young age, a reconsideration of a consultation with physical medical/orthopedic specialist and a pain clinic should be considered.  Following these reports and possibly a psychological evaluation, extended rehabilitation might provide the opportunity for the patient to return to work in a light-duty capacity.

In July 2002, Mr. Roberts reported for a second FCE.  Mary Pullen and Jason Huel conducted this testing and summarized their results as follows:

> The results of this evaluation indicate that Randy Roberts is currently functioning in the sedentary work classification category per the U.S. Dept. of Labor

> Standards. . . . He demonstrated moderate pain behavior and marked magnified illness and self-limiting behavior. . . The results of this FCE are not a valid determination of Mr. Roberts' maximum abilities given the evidence of submaximum performance and marked self-limiting behavior secondary to pain.

Admin. Rec. at 41.

Following this FCE, Mr. Roberts was sent for two additional IMEs. Based on the medical reports of other physicians and the FCE, Dr. Moyer concluded that Mr. Roberts would be able to work in a sedentary capacity, but that he would be limited "to no more than sedentary to light level work where he may be able to stand and walk for one to two hours during the course of a day. . ." *Id.* At 40.[1]  Dr. Lowe, a spinal surgeon, found that Mr. Roberts had limited mobility in his back and symptoms that in his words, "cannot be faked." *Id.* at 30.  Dr. Lowe's estimation of Physical Capabilities was consistent with sedentary to light level work.  Although Dr. Lowe did conclude that Mr. Roberts had some functional limitation he was concerned about the callusing of Mr. Roberts's hands, which he noted several times in his report.  He wrote, based on the calluses, that "you can

---

[1]It appears to the Court that Dr. Moyer misinterpreted the opinion of Dr. Omitowoju from 1990.  Dr. Moyer states that "it was Dr. Omitowoju's conclusion that Mr. Roberts remained totally disabled from his previous job but remained capable of sedentary work."  Admin. Rec. at 40.  From the Court's reading of Dr. Omitowoju's opinion, this is inaccurate.  Dr. Omitowoju's opinion was that *if* Mr. Roberts would be able to do any job then it would be sedentary work.  Dr. Omitowoju thought that this would be possible only if Mr. Roberts underwent surgery to repair his herniated disc and if this surgery was successful.  Unfortunately Dr. Moyer's mistaken interpretation was picked up by other physicians reviewing the medical record at later dates, and ultimately by Defendant itself in its brief.

The mistaken interpretation of Dr. Moyer, however, is not grounds for remand under the standard of review articulated *infra*.  While Dr. Moyer may not have felt Mr. Roberts was capable of sedentary work, two other physicians from the same time period appeared to have that opinion – Dr. Raju and Dr. Nadar.  Dr. Raju explicitly stated that Mr. Roberts could perform the duties of a sedentary occupation.  Dr. Nadar found Mr. Roberts impairment to be only twelve percent.

only assume that the patient is holding something back from you and that his is not totally disabled from any work." *Id.*

In August 2005, the claims administrator sent Plaintiff's medical records to Dr. Martin Mendelssohn, another orthopedic surgeon, for peer review.  In Dr. Mendelssohn's opinion, the medical documentation did not support the finding that Mr. Roberts was unable to perform any occupation.  Dr. Mendelssohn noted that throughout the documentation Mr. Roberts was deemed unmotivated to return to work.  Dr. Mendelssohn also referred to Dr. Lance's findings that Mr. Roberts could perform at a sedentary level, and the FCEs in which Mr. Roberts was found able to perform at a sedentary level despite giving submaximal performance during testing.   Dr. Mendelssohn wrote that "[b]ased on medical documentation as well as the FCE, the restrictions and limitations of a sedentary to light physical exertion level are reasonable and permanent."  Admin. Rec. at 475.

In February 2006, Dr. Lance referred Mr. Roberts for a third FCE at Barboursville Physical Therapy.  Consistent with the earlier FCEs, the results of this testing indicated that Mr. Roberts was capable of sedentary work and expressed skepticism about his level of performance and motivation to rehabilitate.

In a follow-up to the 2006 FCE, the claims administrator referred Mr. Roberts's case to Dr. Robert Ennis for peer review.  Dr. Ennis reviewed the FCE and also arranged a conference with Mr. Roberts's primary care physician, Dr. Lance.  From this information, Dr. Ennis expressed his opinion that the evidence did not support a "functional impairment that would preclude the claimant from returning to any occupation at the present time."  Admin. Rec. at 804.  Dr. Ennis agreed with

the FCE that Mr. Roberts would be capable of performing sedentary or even sedentary-to-light duty work.

On April 1, 2006 Aetna took over as claims administrator for the Plan. Later that month it conducted an vocational assessment report of Plaintiff. The assessment was conducted to "define vocational factors which may impact Mr. Roberts' ability to become employed" and to attempt to locate "feasible employment within 60 miles of his residence in Willow Wood, Ohio. Admin. Rec. at 1160. Included in this review were "positions with earnings of approximately 60% of pre-disability wage" which equates to a salary of $18, 822.23 per year. The assessment determined that Mr. Roberts would be qualified for several jobs within the criteria, including – surveillance system monitor, dispatcher, semi-conductor assembler, check cashier, and telephone order clerk.

On May 11, 2006, the claims administrator wrote to Mr. Roberts to inform him that it would be terminating his benefits as of July 1, 2006. The letter explained:

> We have recently received medical information which indicates that you[r] medical condition has improved. Your complete file was reviewed to determine if you were capable of returning to the workforce. The medical information received from Dr. Darold Lance, D.O. and the Functional Capacity Evaluation dated February 21, 2006 were both taken into consideration. Based on this information you are able to return to gainful employment at the sedentary level of physical demand. Our peer physician who specializes in Orthopedic Surgery has reviewed this information and is in agreement with this determination. Your file was then referred to our vocational expert to determine if there were occupations you could perform based on your education, training and experience that would accommodate your limitations. It was determined that you possess transferrable skills that would fit into the semi-skilled level of employment. . . .

> Our vocational expert then thoroughly researched the geographic area in which you live to determine employment opportunity. The vocational expert found that this occupation pays at least 60 percent of your pre-disability earnings, falls within the restrictions noted above, and is available within a 60-mile radius from where you live. In view of the above, we have found that you no longer meet the Plan's definition of disability under the "any occupation" standard. Benefits are therefore terminated effective July 1, 2006.

Admin. Rec. at 2123-24.

Plaintiff appealed the denial of benefits on November 7, 2006. Included with the appeal, Mr. Roberts attached an FCE he had undergone at the Holzer Clinic in South Charleston, W. Va. The conclusion from this FCE was that,

> The results of the evaluation indicate that Mr. Roberts does not meet the U.S. Department of Labor's criteria for sedentary work as per the Dictionary of Occupational Titles. The validity criteria calculated to 59%. This indicates an invalid validity profile. Mr. Roberts expressed that he was fearful of inducing pain which may have impacted his performance on the FCE. I do not have any recommendations at this time.

Admin. Rec. at 2431.

Also included with the appeal was a letter from Dr. Lance attempting to clarify his position. After explaining that Mr. Roberts was his patient and had been for several years, Dr. Lance wrote "[i]t is my professional medical opinion that Randy is totally disabled and unable to ever return to any gainful employment . . ." Admin. Rec. at 2491. The claims administrator declined to review the appeal because Plaintiff failed to submit it within the allotted time frame.

On September 21, 2007, Plaintiff filed a complaint with this Court.  By Order of November 29, 2007, the Court determined that additional administrative review was required in order to exhaust Plaintiff's administrative remedies. In accordance with the Court's Order, Plaintiff submitted information for an appeal again on April 7, 2008.   In connection with this appeal the claims administrator arranged for peer review of the medical information in the file by three specialists: Dr. Lucy Cohen, Board Certified by the American Board of Physical Medicine and Rehabilitation; Dr. Elana Mendelsohn, a licensed psychologist; and Dr. Lawrence Blumberg, Board Certified by the American Board of Orthopedic Surgery.

Dr. Cohen provided a brief review of Mr. Roberts's medical history back to 1989.  Based on this material she concluded that it did not support Mr. Roberts's claimed functional impairment from August 1, 2006 until the time of her review.  She wrote, "[t]he claimant has had multiple Functional Capacity Evaluations that indicate he is capable of working at a sedentary level job and has been from almost the time of his initial accident."  Admin. Rec. at 1251.

Dr. Mendelssohn noted that several of Mr. Roberts's medical providers had mentioned psychological symptoms, including anxiety and depression over the years.  She further noted, however, that despite the fact that Mr. Roberts saw specialists in many fields, his record did not indicate that he ever saw a mental health professional.  Additionally, there had been no analysis of Plaintiff's cognitive function or behavior to corroborate the claimed impairment.  She concluded that the information in the record did not support a mental impairment that would preclude Plaintiff from working.

Dr. Blumberg, likewise found that the record did not support Plaintiff's impairment.  He noted that "[i]n spite of the claimant's subjective complaints, his physical examination findings do

-12-

not demonstrate a pathological condition that would preclude sedentary/any occupation." Admin.
Rec. at 1630.   Dr. Blumberg pointed out that he gave a minimum amount of effort during
examinations and that "[c]alluses were noted on his hands even though he said he could not do much
other than lay in a chair and watch television." *Id.*

Based on these reviews, the claims administrator upheld the termination of benefits at the
first state of appeal.  A May 8, 2008 letter informed Plaintiff's attorney,

> In spite of your client's complaints, his physical
> examination findings, x-rays and MRI findings do not
> demonstrate a pathological condition that would have
> precluded your client from any occupation, as of
> 7/1/06.   His functional capacity evaluation has
> demonstrated his ability to work at least at a sedentary
> capacity.  There was no evidence that he could not sit,
> stand or ambulate.  There was no evidence that he
> could not lift up to ten pounds.  The information
> submitted does not support your clients [*sic*] inability
> to perform the duties of any occupation for which he
> is reasonably qualified by education, training and
> experience, as of 7/1/06
>
> Based on our review of the submitted documentation,
> and the rationale included herein, a functional
> impairment from any occupation cannot be
> substantiated.  Also, occupations were identified on
> the Employability Assessment dated 4/5/06, that are
> consistent with your client's restrictions, limitations,
> education, training and experience.  Therefore, the
> original decision to terminate your client's LTD
> benefits, effective 7/1/06, has been upheld.

Admin. Rec. at 1243-44.

Plaintiff submitted a second and final appeal on December 8, 2008.  The claims administrator
submitted Mr. Roberts's file to four medical providers who had not previously seen it: Dr. Lawrence
Burnstein, Ph.D. a Board Certified Disability Analyst; Dr. Alan Saperstein, M.D. a Board Certified

-13-

Orthopedic Surgeon; Dr. Seth Wachsman, M.D., an anesthesiologist/pain management specialist; and, Dr. Luke Lee M.D., Board Certified by the American Board of Preventive Medicine. Each of these reviewers agreed that the record failed to support the Plaintiff's functional impairment and concluded that he would be able to work at least at the sedentary level.

Based on the record described, the parties filed cross motions for summary judgement on December 15, 2009.

## Standard of Review

"A federal court's ability to review a discretionary decision of the administer of an employee benefits plan is significantly limited." *Elliot v. Sara Lee Corp.*, 190 F3d 601, 605 (4th Cir. 1999). If the plan vests discretionary authority in the plan administrator or a fiduciary "'to determine eligibility for benefits or to construe the terms of the plan' a reviewing court may reverse the denial of benefits only upon a finding of abuse of discretion." *Id.* (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989). In applying the abuse of discretion standard, the reviewing court may not substitute its own judgment for that of the administrator. The administrator's decision cannot be disturbed if it is "the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Id.* (*quoting Brogan v. Holland*, 105 F.3d 158, 161 (4th Cir. 1997).

In this case, there is no dispute that the claims administrator is independent from the Plan and vested with discretion. The claimant argues, however, that in its review the Court must take account for the fact that the claims administrator is conflicted. The Supreme Court has made clear that even in cases of administrator conflict of interest, there is no more stringent standard of review.

*See Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008).  "Rather, a conflict of interest becomes one of the 'several different, often case-specific, factors' to be weighed together in determining whether the administrator abused its discretion."  *Carden v. Aetna Life Ins. Co.*, 559 U.S. 256, 260 (quoting *Glenn*, 554 U.S. 105).  In light of *Glenn*, the Fourth Circuit has developed a list of eight nonexclusive factors to guide an ERISA abuse of discretion review:

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

*Id.* (citing *Booth v. Wal-Mart Stores, Inc. Associates Health & Welfare Plan*, 201 F.3d 335 (4th Cir. 2000).

The Court considers these factors helpful in reviewing the decision of an administrator vested with discretionary authority and will bear them in mind when evaluating the administrative record and the parties arguments.  It will not, however, emphasize the motivations or conflict of interest of the claims administrator above other factors.  In *Glenn,* the Supreme Court noted that this factor should be important "where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration."  *Glenn,* 544 U.S. 105.  The Fourth Circuit Court of Appeals has placed emphasis on this factor (or in the pre-*Glenn* approach applied a modified abuse of discretion

factor) when the claims administrator is responsible not only for evaluating claims, but for paying them, or insuring the entity that makes payments. *See Carden*, 559 F.3d 256, 260-61 (4th Cir. 2009); *Smith v. Continental Casualty Company*, 369 F.3d 412, 418 (4th Cir. 2004) ("The district court correctly recognized that the modified abuse of discretion standard was appropriate because Continental Casualty, directly and indirectly, both insures and administers the plan.")  In this case, there is no evidence that the claims administrator has a history of biased administrator and no contention that it pays plan benefits or insures the Plan against such payments.  Plaintiff claims simply, that Aetna is conflicted as a result of the fact that it participates in a competitive market and receives compensation for its services.  As this must be the situation for nearly every independent claims administrator, the Court cannot conclude that Aetna's role creates a significant degree of conflict.

## Analysis

In his arguments, Plaintiff asserts four grounds for abuse of discretion: 1) that the record clearly supports Plaintiff's disability; 2) that the claims administrator failed to take into account the claimant's subjective complaints of pain; 3) that the claims administrator placed insufficient emphasis on the social security administrator's decision granting the claimant benefits; and, 4) that the claims administrator did not properly conduct the vocational report.  The Court will address each of these arguments in turn, bearing in mind the factors enunciated in *Carden* for evaluating a claim under the abuse of discretion standard.

**I.**     **The Record Does Not Justify Disturbing the Administrator's Decision**

Especially in the years immediately following Plaintiff's injury there were conflicting reports about his disability and his prognosis.  There is sufficient evidence, however, to justify the claims administrator's decision to terminate Plaintiff's benefits.  While reasonable minds might differ as to the appropriate interpretation of the record, it is not the Court's role to substitute its own judgment for that of the administrator.  As such, the Court does not find that the record supports a conclusion that Aetna abused its discretion by determining that Mr. Roberts did not meet the Plan's definition of disability.

Mr. Roberts's original treating physician, Dr. Shafer, did find that he was totally disabled based on both a physical impairment (as the result of his injury) and varying degrees of mental impairment.  She did not, however, conclude that his impairment was permanent, concluding repeatedly that he could not return to work for the next several months after each visit. While Dr. Omitowoju found that Plaintiff was disabled from his current position, he felt that with proper treatment Mr. Roberts could be retrained for a sedentary position.  One of these early treating physicians, Dr. Raju, found without reservation that Mr. Roberts could have then performed a job at the sedentary level and concluded that his prognosis for recovery was "good."  Admin. Rec. at 166.  Additionally, the first FCE contained within the record indicates that Mr. Roberts performed adequately to meet the requirements for a sedentary position.

As Mr. Roberts continued receiving treatment and therapy for his injuries, the reports from treating physicians and independent medical examiners continued to be in conflict.  Dr. Craythorne and Dr. Leadbetter, two doctors carrying out IME's, both found Plaintiff unable to work in at even the sedentary capacity.  Mr. Robert's chiropractor, Dr. Thompson, and his treating physician, Dr.

Lance, however, each rated him on occasion at only a Class 4 impairment – meaning that sedentary work was possible.  A 2002, FCE agreed with the initial one, that Plaintiff could work at least at the sedentary level – despite giving less than full effort during the evaluation.

Following the 2002 FCE, Mr. Roberts's medical record was sent out for several IME's and peer reviewed following two appeals of the initial administrative decision to deny him benefits. After 2002, each and every physician reviewing the record found that it did not support a complete and permanent functional impairment.  Of two later FCE's, both conducted in 2006, one found that Mr. Roberts could perform at sedentary or even sedentary-to-light duty work, the other found him totally disabled.  Each concluded, based on objective metrics, that Mr. Roberts did not give a maximum amount of effort on the tests.

Based on a medical record composed of initially conflicting medical opinions which coalesce into a conclusion that Mr. Roberts can work at least at the sedentary level, and FCE's which largely find Mr. Roberts able to work at the sedentary level despite giving a sub-optimal performance, the Court cannot conclude that the claims administrator abused its discretion in finding that Plaintiff did not meet the "any occupation" standard of long-term disability set forth in the Plan documents. Arguably there would be justification for reaching the opposite conclusion as well – that Mr. Roberts remains totally disabled.  The Plan did, after all, pay long-term disability benefits to Mr. Roberts from 1991 until 2006.  The letter explained, however, that the 2006 decision was based upon the reports of Dr. Lance, the 2006 FCE concluding he could work at least at the sedentary level, the Plan's own peer orthopedic surgeon, and its vocation expert.  These sources form a reasoned and principled justification for the decision to terminate benefits.  Likewise, each of the physicians reviewing the record on appeal (with the exception of Dr. Lance in his letter supporting Plaintiff)

found that it did not support a complete functional impairment.  The Court would abdicate its proper

role if it overturned the administrator's decision on the current record.


**II.      The Claims Administrator Did Not Err By Failing to Consider the Claimant's Subjective Complaints of Pain or Side Effects of Medication**

Plaintiff's second ground for abuse of discretion is that the claims administrator failed to take

into account Mr. Roberts's subjective complaints of pain and the interactions and side effects of his

various medications.  Plaintiff points out that he described his pain to his treating physician, Dr.

Lance, as 7 on a scale of 1 to 10 with flare-ups as high as 10.  To treat this pain (and other

symptoms) Dr. Lance prescribed Loratab, Soma, and Xanax.  Plaintiff cites *Connors v. Connecticut

General Life Ins.*, 272 F.3d 127 (2d Cir. 2001) for the proposition that it is an abuse of discretion

to fail to take into account subjective complaints of pain, and *Walker v. Harris*, 642 F.2d 717 (4th

Cir. 1981) for the proposition that a reviewer must account of the side effects of medications.

In *Connors*, the Second Circuit Court of Appeals held that "[w]hile a district court reviewing

an administrator's decision *de novo* is not required to accept such complaints [of pain] as credible,

. . . it cannot dismiss complaints of pain as legally insufficient evidence."  272 F.3d at 136.  As

explained, the role of this Court is not *de novo* and so it sits in a different position than the district

court in *Connors*.  Because the standard of review is not *de novo*, under *Connors,* this Court cannot

disturb the decision of the administrator if it is based on a credibility assessment of the claimant's

subjective complaints of pain or otherwise reasonably supported by the record.

The record contains evidence casting doubt on the credibility of Plaintiff's complaints of

pain.  Every FCE Mr. Roberts participated in reported that he gave suboptimal efforts or submaximal

performance.  Some of them explicitly questioned his understanding of the scale used to measure

subjective levels of pain or concluded that he was magnifying his symptoms.  Moreover, Dr. Moyer placed a great deal of emphasis on the contradiction between Plaintiff's description of his time (being able to do nothing but lie on the couch and watch tv) and the presence of calluses on his hands.  Based on this information on the record, the claims administrator would be justified in discounting the claimant's subjective complaints of pain, based on its credibility determination. Additionally, three out of four FCEs in which Mr. Roberts participated determined that he could meet the requirements of a sedentary occupation despite his refusal to perform or continue with certain tests because of subjective complaints of pain. Finally, Dr. Lance, Plaintiff's treating physician rated him capable of performing sedentary work in spite of his subjective complaints of pain.  Based on this information in the record, the Court cannot find that the administrator abused its discretion by failing to account for subjective complaints of pain.

Likewise, the Court cannot find that the administrator abused its discretion by failing to consider drug interactions or side effects.  Significantly, there is no evidence in the record that Plaintiff suffered impairment because of drug interactions or side effects.  While some physicians expressed disagreement with his chronic intake of Loratab and Xanax, those same physicians found him able to perform at least at the sedentary level.   The only mental health professionals to evaluate his record (upon appeal) did not find him impaired as the result of his medications.  Finally, the Fourth Circuit's decision in *Harris* was based upon the failure of a Social Security Administrative Law Judge to actively participate in a hearing involving a *pro se* claimant with only a fourth grade education, and does not stand for the proposition that a claims reviewer must initiate an investigation into possible drug interactions and side effects.

III.     **The Claims Administrator Need Not Have Relied on the Decision of the Social Security Administration Because It Is Devoid of Reasoning.**

Throughout his briefing, Plaintiff criticizes the claims administrator for encouraging Plaintiff to apply for Social Security Disability benefits and then discounting the Social Security Administrator's decision that Mr. Roberts has a total and permanent disability.  These criticisms appear to be based on two arguments: first, that the decision to encourage Plaintiff to secure Social Security benefits is proof that the claims administrator considered Mr. Roberts to be disabled and that it was an abuse of discretion to change this opinion; second, that the decision of the Social Security Administration was given insufficient weight in the claims review process.

The fact that the claims administrator encouraged Mr. Roberts to apply for Social Security Disability benefits and later terminated his plan benefits is not a basis for finding abuse of discretion. Under the term of the Plan, the amount of benefits paid to any member is reduced by other sources of income that member might receive.  *See* Admin. Rec. at 2522.  Social Security Disability is specifically listed as source of income that will offset the amount paid by the Plan.  At the time the claims administrator encouraged Mr. Roberts to apply for (and appeal the initial decision denying) Social Security benefits, the Plan was making long-term disability payments to Mr. Roberts. Supporting Mr. Roberts in the pursuit of Social Security benefits was a sound financial decision. It is in no way indicative of the Plan's view of Mr. Roberts's prognosis or some sort of irrefutable determination of Mr. Roberts's disability.  The Court cannot find that the claims administrator abused its discretion simply because it encouraged Plaintiff to apply for Social Security benefits and later changed its opinion on the degree of Plaintiff's impairment.

The Supreme Court has made clear that the factors which must be weighed in an analysis of Social Security Disability are not necessarily the same factors which must be weighed in an analysis of disability under an ERISA plan.  *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822 (2003).  Because ERISA allows freedom for the parties to contract, many regulations governing the award of Social Security benefits and review of those decisions do not apply to ERISA.  *See e.g. Smith v. Continental Casualty Co.*, 369 F.3d 412 (4th Cir. 2004) (Social Security standard for evaluating subjective complaints of pain not binding in ERISA).  Indeed, the character of the review in the Social Security context differs from that in ERISA because the so called "treating physician" rule does not apply in ERISA.  *Black & Decker Disability Plan,* 538 U.S. 822.   Under the treating physician rule the Social Security Administration must "give more weight to the opinions from . . . treating sources" and justify any conclusion different than that of the claimant's treating physicians.  *Id.* (quoting 20 CFR §§ 404.1527(d)(2), 416.927(d)(2).  ERISA claims administrators are under no such obligation and are free to credit the opinions of other physicians as much weight as that of the treating physician.  With the existence of such difference between Social Security and ERISA, the claims administrator is justified in discounting a Social Security Administration decision devoid of reasoning.[2]  Without an explanation of why Social Security benefits were granted, the claims administrator cannot properly evaluate and weigh the administrators decision.  For this reason, the

---

[2]The only source of information regarding the final decision of the Social Security Administration is a letter from the Commissioner of Social Security to Mr. Roberts.  *See* Admin. Rec. at 217-20.  The final administrative decision does not appear in the record and is therefore unavailable for this Court's review.  Plaintiff had ample time to supplement the record with this decision if it was favorable and if it provided significant evidence in his favor.  On the evidence contained the record, the Court cannot conclude that it was an abuse of discretion not to grant greater weight to the Social Security decision.

failure to grant significant consideration to the award of Social Security Disability benefits is not an abuse of discretion.

**IV.      There Is No Obvious Error Or Abuse of Discretion in the Vocational Report**

Plaintiff's final argument is that the vocational report was not properly conducted.  This report was filed on April 5, 2006.  It identified potential employment for which Plaintiff was qualified based on education, training and experience, that paid at least 60 percent of Plaintiff's pre-disability base salary and which was located within 60 miles of Plaintiff's residence.  Plaintiff argues that this report was improper because it did not account for inflation or wage growth over the period of time he was out of the workforce.  He further argues that the report was flawed because the vocational expert never met with him or conducted any testing of his abilities.

The Court does not find that either of Plaintiff's criticisms of the vocational report are grounds for finding an abuse of discretion on the part of the claims administrator.  Plaintiff provides no authority to support his contention that wages must account for inflation or other growth over his period of unemployment.  Neither is the Court aware of any such authority.  To impose such a requirement would infringe upon the freedom of employers and employees to negotiate and agree upon an ERISA plan as they deem fit.  *See Black & Decker*, 538 U.S. at 833; *Kress v. Food Employers Labor Relations Ass'n*, 391 F.3d 563, 568 (4th Cir. 2004).  Additionally, benefits paid by the Plan are equivalent to 60 percent of the member's pre-disability base salary – without adjustment for inflation or wage increase.  It makes sense that substitute employment would be assessed on the same criteria.

Plaintiff's claims that the vocational expert should have met with him or tested him are likewise made without authority in support.  The purpose of the employment assessment is not to assess a claimant's impairment or ability – that is the role of physicians and functional capacity evaluations.  The vocational expert complements the functional assessments by accepting their conclusions and applying them to the job market applicable to the claimant.  That was the role performed by the vocational expert in this case, and it cannot be the basis for an abuse of discretion.

## Conclusion

For the reasons explained above, the Court cannot find that it was an abuse of discretion for the claims administrator to terminate the Plaintiff's ERISA benefits.  As a result the Court **GRANTS** Defendants' motion for summary judgment (Doc. 52) and simultaneously **DENIES** Plaintiff's motion for summary judgment (Doc. 54).  The Court **DIRECTS** the Clerk to send a copy of this written Opinion and Order to counsel of record and any unrepresented parties.

ENTER:   July 19, 2010

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE